17-7064 et al., Alan Philipp et al. v. Federal Republic of Germany, a foreign state et al. appellate. Mr. Freeman, for the appellate. Mr. Obama, for the appellate. Good morning, Your Honors. Good morning. May it please the Court, I'm Jonathan Freeman on behalf of the Federal Republic of Germany and the Prussian Cultural Heritage Foundation, and I am reserving five minutes for rebuttal. Your Honors, the expropriation exception provides no jurisdiction over the foreign sovereign defendants in this case unless the amended complaint alleges that a forced sale of an art collection amounted to a genocidal taking in violation of international law. This Court in Simon found that a sovereign can take property from its own national in violation of international law when the expropriations themselves amount to genocide. And that phrase reoccurs three times in the decision. International law, as Simon holds, defines genocide to include takings that cause conditions of life calculated to bring about a group's physical destruction in whole or in part. And the amended complaint here doesn't come anywhere near that. I want to point out four things that the complaint doesn't allege and four things that the complaint does allege, which make that clear. The complaint doesn't allege that anyone involved in the negotiations ever so much as mentioned that the consortium owners were Jewish. You can look at the letters that are appended to the complaint. You can look at the allegations of the complaint itself. You can go over the complaint with a fine-tooth comb. That allegation is never made. There's no allegation, second, that the property taken. It does allege that, quote, Nazis wanted the art because it was valuable. Wait, I'm sorry. Here, I'm looking at paragraph 25. Here, it alleges, quote, the art dealers were Jewish and the collection was wrongfully appropriated, not least because they were regarded as state's enemies for holding the art. So the allegation is that they themselves were regarded as state's enemies because they were holding an art treasure that the State wanted because they were Jewish. That's what this sentence is. Well, yes, Your Honor, but there's no allegation that anyone actually involved in the negotiations ever mentioned the Jewishness of the owners of the member firms. You have, it seems to me, a really tough argument to make to try and somehow separate this from the other horrors that were taking place in Nazi Germany at this time. And it's a hard argument to make, isn't it, when we have allegations of evidence of collaboration at the highest levels that this art collection was a target, a high target for the Nazis in their plans. And you've got to be able to somehow make this look like it's just a business deal that, a normal business deal that took place in the wake of the Depression. That seems to me to be turning a blind eye towards the reality of what was taking place in Nazi Germany. Well, Your Honor, I don't mean at all to suggest that this was, this is alleged to have been simply a business transaction during the Depression. There's no question that the amended complaint alleges discriminatory treatment of Jews in the period from 1933 to 1935. There's no question that the amended complaint alleges persecution of Jews during that period. In terms of the first of the four things that I wanted to point out, let me mention that the letter from Krebs that is cited in the complaint, one of the two letters before the sale in the complaint, doesn't even know who owned the Guelph treasure at the time. You're talking to what? The letter from Krebs that is in the complaint, and that's at, I'll give Your Honor the exact site for that. That's pages 105 to 106 of the joint appendix. It says that, according to reliable information, the largest section of the Guelph treasure has not yet been sold and is in the safekeeping of banking companies. That's 106. It doesn't even know that there's a consortium of art dealers. Later on, of course, it is known. But the point is that the desire to purchase the Guelph treasure, the Welfenschatz from the beginning, is, as Your Honor said, because it was understood to be an important part of German cultural history and tradition, cultural heritage, et cetera. I want to move on to the second of the four things that's not alleged in the ---- Roberts. Well, let me just ask you, what do you do with the, you know, both briefs cite the HVRA, the statute, and Congress, Congress, there's a finding in that statute that the Nazi policy of looting art was a critical element and incentive in their campaign of genocide. So we have a, not only do we have the allegations of the complaint, we have a congressional finding that the seizure of art was a critical part of the genocide here. And I'm sorry, Your Honor, was Your Honor quoting the HERE Act there? Yeah. Yeah. Yes, Your Honor, there's no question that that is a finding in the HERE Act. Right. But we're talking about now negotiations from 1933 to 1935. So the takings that occurred later, the storm troopers marching into houses or the forced sales for a token amount happened, as Your Honor knows, from the DeChapel case in the period much later than this. So this is before the Nuremberg laws. This is before the laws for the organization of Jewish property. This is before Kristallnacht. I understand all that. But we have allegations. We have two things. This is a motion to dismiss the allegations in the complaint that attacks on Jewish people and Jewish merchants had already begun at this point, that concentration camps had been opened. And Congress in two different statutes, both the FSIA and the Holocaust statute, has defined the Holocaust as beginning in 1933. So. Well, Your Honor, the question is not. Isn't that? I mean, how could we possibly, given Congress's definitions of the period of the Holocaust under these two statutes as beginning in 1933, how could we possibly write an opinion that said it hadn't begun at this time? Well, Your Honor, this case does not require the Court to write an opinion that says when the Holocaust began or didn't begin. This case requires the Court to decide whether the act in question. My argument is you just told me that this is pre-Nuremberg laws, pre-several other things. And I was simply pointing out to you that the Congress of the United States disagrees with you about when the oppression of Jews in Germany began. And I just don't see how a court could reach, could possibly accept your argument given these findings about when it began. Your Honor, the question is not when the Holocaust began. The question is whether the takings alleged in the complaint are themselves genocide. And that's a question as to whether the property taken, allegedly taken, was essential to survival. That's what Simon says. That's what the Genocide Convention says. That's what U.S. law says incorporating the Genocide Convention. And the property that's essential to survival, as defined in international law, and that's what this Court has to apply, is food, medicine, shelter, clothing. It's not an art collection that sold for millions of dollars after years of negotiations when the sellers could travel outside of Germany and did, according to the amended complaint, in order to sell the art or to leave years before the deportations to concentration camps and ghettos began. That's not an allegation of a taking that caused conditions of life calculated to bring about a group's physical destruction in whole or in part. It's an allegation of a heavily negotiated negotiation that stalls at times, where attempt to keep other builders out of the picture. These are not things you do if you're taking property in an effort to commit genocide, to prevent the sellers from having conditions of life that allow them to survive. And that's, of course, the focus of genocide. Scalia. Isn't that a good argument for the jury at the next step? No, Your Honor. Under Helmreich, under the Supreme Court decision in Helmreich, it's a question for this Court to determine whether the allegations in the amended complaint amount to allegations of a taking in violation of the international law of genocide. And it's not, going back to Judge Tatel's question, a question of whether this occurs in the Nazi era or whether it occurs within the period defined as the Holocaust. The question is whether this takes place as part of a concerted effort to eliminate Judaism and Jews in Germany. And that's the first question I ask where you have a really tough burden to try and answer, as somehow being separate and apart from the other examples that we've had. Well, Your Honor, I don't think that is the test, because the law of genocide requires both an intent element and an act element. And the act element, as defined in Simon, is whether this is a genocidal act if and only if it imposes conditions of life calculated to bring about the destruction of European Jewry. This transaction, not about whether years later there are acts that in fact drew to, of course, bring about the destruction of a large part of European Jewry. That's not – it's whether this act, this transaction with these sellers for millions of dollars, and this act, this – on its face, Judge Wilkins, going back to your question, under Helmreich, on the face of the complaint, this taking does not create conditions of life calculated to bring about the physical destruction of the group. And in fact, when you – So is it your point that this is not a taking? Your Honor, assuming arguendo that this is a taking, the question is whether it's a taking in violation of international law, whether it's a taking that is itself a genocidal act. Because you said they received millions of dollars for it. So I was wondering whether you're arguing that it was a commercial deal, not a taking. Well, it's clearly an allegation of a sale under duress. Well, you accept, for purposes of this case, that it was a taking, right? We accept that it's an allegation of a sale under duress. And even if it is a taking, it's not a taking in violation of international law, because it's not a taking that is itself an act of genocide. So if we don't agree with you about that point, if we think that the question before us is whether or not this act of a taking of art owned by Jewish art dealers, if we think that that is part of the, as Simon put it, the, and Congress put it, the strategy of the German government to deny Jews their rights, in other words, if we don't think your laser-like focus on this sale has merit, what, do you lose them? In other words, is that the end of your argument about whether or not this is a taking in violation of international law? Well, no, Your Honor, because international law does not define genocide as any taking that occurs under a regime. I just asked you, if we don't agree with that, if we think that given all the allegations in the complaint and given Simon and given the findings that Congress has made about the period of the genocide and the seizure of art as part of it, if we think that you look beyond the individual incident and conclude that this is part of it, do you lose them or do you have another argument about that? Well, Your Honor, on the jurisdictional side, if this Court concludes that any alleged taking after January 1933 until the end of the war is an allegation of a genocidal taking, then, yes, you're ruling against us on the jurisdictional question. Again, that's not what Simon held. Simon is very clear that it's a narrow exception. And in the circumstances of that case, in 1944 and 1945, when the very clothes are being taken from the backs of the Jews who were being deported to ghettos and then concentration camps for their murders, where their last remaining property is taken away, of course that's property that is essential to survival and is intended to cause the physical destruction of the group. That's entirely different from the situation we have here. But, Your Honor, even if you rule against us on jurisdiction, there are, of course, two other issues in the case. One is the question as to whether these State law causes of action have been preempted by Federal foreign policy, and the other is whether the exhaustion doctrine of comedy requires that this case first be heard in a German court. Do you want to go on to those? Yes, Your Honor. I would begin with the preemption doctrine. It's long been established, in fact, since shortly after the end of the war, that United States foreign policy is for the nations where the alleged Nazi-looted art is located to oversee the restitution process. That U.S. foreign policy comes to its culmination in the U.S. spearheading of the Washington Principles. And the Washington Principles themselves, of course, which are organized by the United States State Department, is leading matter. Stuart Eisenstadt is at the helm of that. Those principles say that nations ought to create commissions within their own nations in accordance with their own legal traditions to resolve these issues. And, in fact, there's a preference for alternative dispute resolutions. In fact, that preference for alternative dispute resolutions, Judge Tatel, is reinforced itself in the HERE Act, where, again, there is a preference given to mediation panels in the Senate report. But the HERE Act actually extended statutes of limitation to facilitate just this kind of case, didn't it? Well, it extended statutes of limitations. It said nothing to alter U.S. foreign policy. No, but, well, wait a minute. It was passed by Congress. Why would Congress – why would Congress – why would Congress extend statutes of limitations for a case just like this if it thought that litigation like this was contrary to American foreign policy? Well, I take issue with your assertion that it's a case just like this. There's nothing in the Act or in the legislative history that says that the Act is in some way directed towards even thinking about cases against foreign sovereigns. In fact, the legislative history – Well, it was passed in part to overrule part of the Ninth Circuit decision that had done just that. Well, the decisions that are cited in the legislative history are the decisions involving Toledo Museum of Art, Detroit Institute of Fine Arts. These are domestic suits against U.S. museums involving art in the United States. Absent some kind of clear statement in the HERE Act, and there's none because it involves statutes of limitations, absent some kind of clear statement, there's no reason to think that U.S. foreign policy, which has been clearly expressed by the Solicitor General on behalf of the State Department before the U.S. Supreme Court, has been changed. The U.S. foreign policy involves what happens when the art is located in foreign sovereigns and when those foreign sovereigns create a commission. And the U.S. says very clearly that plaintiffs cannot be given the opportunity to sort of try again by bringing plaintiffs. You've used the word preference, that there's a preference in U.S. policy for having this resolved in front of the Advisory Commission. Preference is different than a bar from using the U.S. courts. I spoke loosely, Your Honor. What the Solicitor General, in fact, says in the von Sayer brief is that plaintiffs should not be able to come to U.S. courts after they've brought something before the Advisory Commission. And the reason for that is it undermines this very purpose of restitution within the nations where the art is located. It undermines the Washington principles. What do we make of the allegations by Philip that the Advisory Commission is a sham? We're looking at this on the complaints. We have that allegation in front of us. What do we make of that? Well, Your Honor, you should look at them in the same way that you look at such allegations with regard to a foreign nonconvenience issue or an enforcement of judgments issue. The allegation that a German Advisory Commission is a sham without specific allegations regarding the way in which it's a sham, and there are none here, is a conclusive assertion that it does not pass muster under ICHBAU. Have you – is that issue before us? Yeah. This particular – it is? I'm sorry, Your Honor. Did you – I mean, did you challenge in your brief the district court's ruling on that specific question? I had read your brief as saying the plaintiffs should be required to exhaust their remedies in German courts. Yes. These are two separate issues, Your Honor. Right. And the issue we were just talking about, is that before us? Yes, Your Honor. All three issues are before you. All three were accepted by this Court. All three? Yes, Your Honor. The preemption issue is distinct from the comity exhaustion issue. The preemption issue, as I said, involves whether plaintiffs who have brought a claim before a foreign advisory commission may try again in the United States if they don't get what they want in the foreign advisory commission. The comity exhaustion issue, Your Honor, raises the question as to whether they ought to be obliged to bring their claims first in a German court if they insist on bringing their claims in court after the advisory commission. And under the NML decision, which is, of course, cited by the amicus in support of the plaintiffs, makes it very clear that comity survives the enactment of the Foreign Sovereign Immunities Act. That's something that's also made clear by the Supreme Court decision in Altman, which acknowledges that the active State doctrine, of course, the Supreme Court says, survives the enactment of the Foreign Sovereign Immunities Act. It's just like the foreign nonconvenience doctrine. The Foreign Sovereign Immunities Act does not alter substantive law, so these traditional common law prudential principles continue to apply. So the comity doctrine applies. And as we've pointed out, comity requires the exhaustion of remedies when it's a claim against a foreign sovereign under the expropriation exception. Sotomayor What do you do with all the language in Republic of Argentina, which suggests quite clearly that, you know, with respect to issues like comity, Congress took care of that in the FSIA. That all of these defenses are now governed by the plain language of the FSIA, nothing else. That the courts don't have any right to fashion additional comity remedies. Horwich Your Honor, we're using different names for the same case, but that's the NML case that I was referencing a moment ago. And no, Your Honor, what the NML case says is that comity concerns are incorporated in the FSIA. But it also says very clearly that comity survives. Because what happens there is Argentina says we're immune under the Foreign Sovereign Immunities Act from any kind of post-judgment discovery. And the Supreme Court says, no, you're not. But comity is still an available defense. That's from the direct text of NML. And the reason for that, Your Honor, is that comity, of course, includes lots of different contexts. It includes the application of foreign law. It includes the active state doctrine. It includes the prudential exhaustion requirement. There are many aspects of comity, one of which is the jurisdictional aspect that Congress codified in the Foreign Sovereign Immunities Act. But again, as both Republic of Argentina v. NML recognizes, and as I mentioned a moment ago, as the Altman case in the Supreme Court also recognizes, these other comity doctrines survive the enactment of the Foreign Sovereign Immunities Act. Roberts. If we agreed with you on your prudential exhaustion argument, how are we to think about this? Is your argument that we have the power as a matter of prudence to require exhaustion in the German courts, but that we need not do that depending on the equities of the case? Is that how it works? Well, Your Honor, the Supreme Court in the Pimentel decision involving the Republic of the Philippines makes clear that exhaustion is required under the doctrine of comity when the events at issue involve historical events of great political importance. And there's no question that the allegations here involve such events. So even if it is at some level a discretionary doctrine, this Court is guided by Pimentel in this case. And I want to draw the parallels with the Pimentel case for a moment. So the Pimentel case involves competing claims by the Republic of the Philippines itself and victims of human rights abuses from the previous regime, Ferdinand Marcos's regime, to a pot of money that is present in the United States. In the same way, of course, this case involves competing claims between the foreign sovereign here, the Federal Republic of Germany and the Prussian Cultural Heritage Foundation, and those who are the descendants of alleged violations of international human rights. But here it's even more severe in terms of comity, because the property is not located in the United States as it was in Pimentel, but located in Germany, such that a court – a court would need to say, you, the Federal Republic of Germany, and your instrumentality must turn over property in Germany over to the United States. And so the Pimentel rationale is a very strong one. And this isn't just any property in Germany. This is a national treasure. It is a national treasure, Your Honor, and that's why it's held in an institution similar to the Smithsonian Institution here in Washington. So we think comity concerns are absolutely under their apex, and apex is whether there is any discretion at all. It's not present here under the guiding law of Pimentel, and exhaustion must be required. I want to take a moment to – the plaintiffs have, of course, alleged that it would be futile to go before a German court, and so exhaustion should not be required. And the futility requirement is an important aspect of the doctrine, because it does involve concerns of fairness. People should not be forced to exhaust their remedies in a court that there's no reason to think would be impartial or fair. But the plaintiff's argument, as the plaintiff's expert himself acknowledges, is just that German courts, as he says, are fickle, and it's not clear whether they'd be able to bring a claim, despite the fact that he acknowledges in a previous case of Sachs someone who brought a restitution claim regarding Nazi-confiscated art and lost before the advisory commission, went to a German court, and then won. In those circumstances, Your Honor, it's impossible to conclude that it would be futile for plaintiffs to exhaust their remedies in a German court. And, Your Honor, going back to the sham issue for a moment, because ultimately there is an allegation, an underwriting allegation here, that you can't trust Germany. You can't trust the Federal Republic of Germany. You can't trust its courts. You can't trust its advisory commission. I would point out, as we have in our briefs, that this is 83 years after the transaction edition. This is the Federal Republic of Germany, which is a staunch ally of the United States and one of the leading democracies in the world, and has been found by courts in the United States across the board to have courts that are fair and are impartial. And there's no reason to think that they would not be fair and impartial here, and no reason to think that the advisory commission, which, Your Honors, was led by the Federal Republic of Germany and included the first president of the reunified Germany after the fall of the Berlin Wall, was anything but a fair and impartial tribunal. Roberts. Can I take you back to the first point we were talking about? I want to make sure I completely understand your argument about why this isn't taking in violation of international law. Is the point that there's no evidence that the purchasers here knew the art – did they know the art dealers were Jewish? Is that the key point? Well, no, Your Honor, that's not – What is your key point? No, that's not – that's not our key point, Your Honor. That's a point that the Court should bear in mind. Okay. But I would say our key point – Yeah. I would say our key point is that the property taken here was not essential for survival and so did not impose conditions of life intended, calculated to bring about the physical destruction of the group. How do we know it's not essential for survival? I'm sorry, Your Honor? How do we know it's not essential for survival? Just because it's an art collection? No, there's a number of things from the complaint that you can – that you can use to come to that inevitable conclusion. One is that they received millions of dollars. Another is that there's no allegation that they were unable – excuse me, Your Honor? Suppose they had received a million dollars instead of – how much was it? 3.5. It was several million dollars, Your Honor. Suppose it was one. It was 3.5 million Reichsmarks. I don't have the exact – Reichsmarks, right. Yeah. It's not a transaction. Suppose it was one million dollars. Your Honor, the – I mean, is your point that the payment took it out of this category? You're not arguing that, are you? Well, we're arguing that this is, in fact, a factor to consider in looking at whether this imposed condition – Well, now, I'm asking you how we – if it's a factor, then I'd like you to explain to me how we evaluate that factor. Well, there may – They claim – I think they claim it was 15 percent of the value of the art. No, Your Honor. Their claim is that it was 33 percent of the value of the art. Okay. Well, suppose it was 15 percent. Would that have made a difference? No, I don't think it would matter, Your Honor. How about 10 percent? Yeah. Your Honor, the – Why? Your Honor, I – the question as to whether it's calculated to bring about the physical destruction of the group and whether, in fact – It's their livelihood, right? This is their livelihood that was being – They are art dealers, yes. There's no allegation that they had no other inventory. In fact, it's clear from the – that at this particular time, art dealers – they had lost many of their customers. It was extremely difficult. They really had no choice but to sell it at this profit – at this price. Those are the allegations in the complaint. Well, Your Honor, the allegations are, of course, that the art was located in Amsterdam and that they were free to and did travel outside of Germany and that all but one of them ultimately did. You might succeed at that on summary judgment, but the allegation in the complaint is the members of the consortium were completely cut out of the economic life of Germany. Major dealers' collections were liquidated because they could not legally be sold. Paragraph 20. Jewish art dealers lost their Jewish customers. I mean, these are the allegations in the complaint. And you may be right, as I said, about if you file a motion for summary judgment. But at this stage, where we have to accept these allegations as true and view them in the light most favorable to the plaintiffs, their whole argument is that, number one, yes, it's art, but this was their livelihood, which you conceived in your briefs. This was their livelihood. And they claim their livelihood was being destroyed because of discrimination against Jewish purchasers and everybody else. They couldn't sell it. That's the allegations of the complaint. You can and should take those allegations as true at this stage, but they're not enough because    But if you want to win your case, what else is needed? That's what I'm looking for. Even if they allege that they need to win your case, what is it that they didn't say that they should have said here? Well, it's not what they didn't say, what they should have said, because there's nothing that they could have said. It's not that they can amend the complaint and fall within the assignment exception. I understand that. I'm asking you what's missing in this complaint. Well, what's missing, Your Honor, under the assignment for an act to be a genocidal taking, to create conditions of life that makes the destruction of the group more likely. You have to have the sorts of things that you had in Simon or to Chappell. Or let me give you an example, Your Honor. But the allegation, in fact, the allegation in Simon was that they were destroying the livelihood of Jews in Hungary at the time. And here we have the same allegations. They're not stealing their food, but these people are in the business of selling art, and this is part of the process of destroying their ability to make a living. Well, Your Honor. That's the allegation. Preventing someone from practicing their chosen profession is unquestionably persecution, is unquestionably discrimination, but it is not a taking. And as Simon said, the taking must be an act of genocide. A law prohibiting someone from being an art dealer, economic conditions making it impossible for someone to be an art dealer, that doesn't amount to a taking of genocidal under Simon. And I can give you what Your Honor asked for examples. Well, what would be examples of a taking other than Simon? And Simon is not about just taking away their livelihood, as Your Honor knows. It's about taking away their last worldly possessions en route to their murder as Jews. So that's a very different case. But what would be enough? What would be enough, Your Honor, is if subsistence farmers had their seed stock taken by the government. That's genocidal, because that intends to starve the people to death. That creates conditions of life that aim to destroy part or all of the group. If, in fact, you could have a combination, Your Honor, of laws and a taking, if you said Group X may only be carpenters and then you seized their carpentry tools, well, that would be a taking that was itself genocidal. So your argument is that if I'm a lawyer and the government says, basically, we're going to prevent you from practicing as a lawyer or we'll just take all of the revenue from your law office, that's not really genocidal, even if it's done as part of an attack on my race because I could still go work at McDonald's or something and support myself? That's correct, Your Honor. It's persecution, but it's not genocide. Genocide has enumerated definitions of what genocidal acts are. There may even, Your Honor, just assuming arguendo, there may be a genocidal intent there, but there's still not a genocidal act. There's nothing that's taken, let alone something that's taken that itself imposes conditions of life that will destroy part or all of the group. Let me go back to the – I hear what you're saying, but here's a congressional finding, quote, the Nazi policy of looting art, looting art, was a critical element in their campaign of genocide. That's a congressional finding. Yes, Your Honor. This Court is required to, in the context of the expropriation exception, to interpret the international law of genocide. And even if this Court were – and that's a judicial requirement, right? It's not a question as to what Congress has concluded about a historical matter. This Court has to conclude on these facts, on the facts of this case, whether this was a taking in violation of the international law of genocide, whether it was a genocidal act. And Congress has not, of course – If we agreed with the congressional finding, then this would be a genocidal act, right? No, Your Honor. Wait a minute. Let me say it. As I understand it, the looting of art treasures, according to this statement, was genocidal. Yes, Your Honor. Congress is not specifying in that statement. So you're saying this wouldn't be a – this is not, in your view, this is not looting of art treasures? Your Honor, later in history, there were unquestionably examples of – But your argument is this is not – this case before us does not allege looting. This is not an alleged genocidal taking into chapel, Your Honor. The defendants don't even protest. I'm sorry. I have been advised that I need to interrupt you and we need to call a recess because apparently there's smoke coming out of something. So the Court will take a brief recess until we figure out where this smoke is coming  Thank you very much. Stand at ease. This is called the Court will now take a brief recess. Stand at ease. This is called the Court will now take a recess. Be seated, please. Okay. I think we are all safe. Let's see. Mr. Freeman, Freeman, you are way over partially because of our questions, so we'll go ahead and hear from the plaintiffs and then you can have a couple minutes on rebuttal. Okay? Thank you, Your Honor, and may it please the Court. My name is Nicholas O'Donnell and I represent the plaintiffs and appellees in this action. The expropriation of the Foreign Sovereign Immunities Act provides jurisdiction over claims, the claims in this case, precisely because Germany's vast scheme to plunder the artwork of Europe has always been considered a crime against international law. And as Judge Tatel noted, that finding is expressed, has been expressed recently by Congress. I think in considering that aspect of the transaction we're talking about, it is critical to remember two parts about the context in which this takes place. The first is, as Congress found, as cannot be disputed, that the specific targeting of art collections owned by Jews was a fundamental component of the Nazi regime. The Nazi regime cannot be parsed and divided into its genocidal and non-genocidal components. It is quite literally the reason the term was invented. As a result, the prominence of that looting puts into question and has been ended in the Inter-Allied Declaration of 1943, known as the London Declaration, the need to address Germany's plundering of art from people because of who they were. And Congress has found this. In addition, and the discussion to this morning focused quite a bit on the nature of the property taken and the nature of the taking, there is, in fact, no question that the economic destruction of Germany's Jews was the intended result from January 30, 1933. This was not an incidental component that arose later. It was not an afterthought. It does not matter that the death camps were not organized until 1941, although, as we note and as is pleaded in the complaint, one of the correspondents about getting this collection back was a participant at the Wannsee Conference at which the extermination of European Jews was planned. But more to the point, and the case that appellants do not spend much time talking about is the de Geppel case, because the de Geppel case, also in Hungary, like Simon, decided by this Court last year, is not a taking at a gunpoint at the side of a railroad track. The de Geppel case concerned an art collection which the owners brought to a museum thinking that perhaps it would be safe there. And, of course, it turned out quite differently. And like our case, like the Altman case, like the Kasira case, like the Malevich case, the question is not, is the artwork sold and used dollar for dollar for the next day's survival? It's that the targeting of the Jewish people as such to take their property, to take away their ability, as Judge Wilkins noted, to practice their chosen profession, which, by the way, was one of the first decrees of the Nazi regime, was to expel Jews from the Reich's chamber of culture, without which you couldn't practice in the cultural arts. I think it's interesting, and this is not in the briefing, because I observed it last week in Berlin at the Monument to the German Resistance, which on a wall text noted that the National Socialists called on the population to boycott Jewish businesses on April 1, 1933, and began excluding the Jews from economic life. Those are their words. And it's exactly what they intended to do, and it's exactly what they did. But one of your friends on the other side's argument that the evidence even has pled is that they sought this art because of its importance to the nation, not because they were trying to deprive the owners of ownership as Jews. Because, Your Honor, I think on the record, and as pled, it is both. And a substantial motivation. It is true that Mayor Kreb's letter to Hitler himself does not mention my clients, but it is alleged, because it is true, that the Consortium's ownership of this collection incensed the Nazis. The very idea that not only were Jewish art collectors able to conduct their business, but that they would be in possession of this archetypal German art was part of the motivation. And, again, that goes to who they are, not simply what the collection is. Likewise, in that letter, again, we can look throughout the record, throughout this period of history, and guess about what was not said. Yes, it is true that we don't have a complete record of who said what to who. So under your view of this, what are the allegations that need to be made with respect to a specific transaction? I mean, I understand your point about the overall picture in Germany at the time and the congressional findings and the allegations. But what has to be alleged with respect to this transaction? Your Honor, what has to be alleged with this transaction? You're taking in violation of international law. Well, first of all, is that as a starting point, the context is a critical component of the allegation. This is a unique circumstance. Second, that the transaction was not at arm's length as a result. After that, and this is the case. And you have those, and those allegations are in the complaint. Yes, Your Honor. Right. And the defendants may endeavor to prove at trial that my clients received fair, adequate, and readily available compensation. They didn't, but they can try. And that's what has to be alleged, is the lack of that adequate compensation. It's alleged clearly the price was inadequate on its face. They were not able to access all of it. And a further portion of it consisted of second-rate artworks that they were essentially foisted upon them. And that's enough, because that's the target, that's the intent of the genocidal regime. Likewise, and it goes to this sort of starting presumption, but it's an additional layer in this case, this is not merely a case involving Jews on one side and a counterparty on the other. This is a case in which Hermann Goering, right after the acquisition, makes a great show of presenting it to Hitler. And it is alleged in the complaint because it is true. Are you going to – are you planning on dealing with the preemption and exhaustion issues? Yes, Your Honor. I'd be happy to move to those. Let's just finish the point you were making. I was going to say, Your Honor, with regard to Goering specifically, it is well-known, it is alleged because it is true, that Goering, despite his vast and essentially complete power over people's lives, still went to the pretense of papering transactions, particularly acquiring corporations, acquiring some sort of paper trail. And that's what happened here. And one more question, and then I, too, want you to get to Judge Griffith's question, what role does the congressional finding about the Nazi seizing of Jewish artwork play in the way we interpret the statute? Your Honor. Counsel seemed to say that's irrelevant. It's not irrelevant. It would be relevant. You know, congressional findings, of course, are not the law itself. I think it would be relevant only if the intent were unclear, which I think appellants need to argue to prevail, but if they convince the Court that the statute was sufficiently unclear, then the next step would be to look to the congressional findings, which should be. I take it your point is, based on the allegations of the complaint, you don't need the congressional findings. Correct, Your Honor. Is that right? Correct. Good. Correct. I think the allegations of the complaint are consistent with the congressional findings. With regard to the preemption and comedy arguments, the case is not preempted and State law claims are not preempted by the foreign policy of the United States as this Court and other courts of appeal have repeatedly held. I think it's important to address the appellant's argument about the Solicitor General's brief in the von Sager case. The von Sager case concerned property that had been the subject of claims in the Dutch post-war restitution legal regime. The Dutch, like the Germans, adopted a very short time-limited series of laws to allow people to make claims. The Houdsteker family, Murray von Sager is Jacques Houdsteker's heir, another victim of Hermann Goering, by the way, the Houdsteker family made claims to the Dutch panel, which was not an advisory commission. It was a panel. It was the adjudicatory scheme under Dutch law at the time. That panel ruled against them. And what the Ninth Circuit, what the Solicitor General expressed a concern about was U.S. courts asking, being asked to come to a result different than that Dutch panel in the 1950s. That example has no parallel to this case, because I do want to spend some time in my remaining time talking about the advisory commission and what it is and what it isn't. The Washington Conference on Holocaust-Era Assets in 1998 resulted in the Washington Conference Principles on Nazi Confiscated Art, which fundamentally are aspirational. They exhort the participants to reach just and fair solutions. And in connection with that, five countries, Germany among them, in Europe, adopted some sort of new approach. And the advisory commission founded in 2003 is that approach in Germany. It is an advisory commission. There is no dispute that it is not an arbitration. It is a mediation, if it needs to even be characterized in the legal sense. But the participants are free to ignore its recommendations, and German museums are not required to go to it. So the parallel between the advisory commission in 2014 and the panel in the Netherlands that the Solicitor General was concerned about 10 years ago are, I think, quite different. With regard to comedy, the appellant's argument there has shifted quite a bit. The appellants now argue that we need to be fair. Sotomayor, let me just, before you go on. Please. What role does, in your mind, does Congress's extension of the statute of limitations play in all of this? It is a very important role, Your Honor, because as Judge Griffith noted, the expression of the preference of something in lieu of litigation acknowledges the availability of the litigation. And sovereign defendants in particular have been arguing for 20 years that claims like ours violate the foreign policy of the United States. And they have been unsuccessful even before this. But the HERE Act, we submit, is a conclusive expression of the policy of the United States with regard to this issue. It is, again, if that statement were considered to be unclear, then one would look to the congressional record in which it is absolutely unambiguous in a unanimous political moment, something we don't hear very often these days, that all of the defense appellants are aware of claimants not getting their day in court. And so the idea, as the panel has mentioned earlier, that Congress, in passing that law, nonetheless intended to allow claimants to be cut off or to be required to go elsewhere, those are inconsistent, and I think the statute can't be read that way. The point I'll make about comedy is, in the briefing below, the defense appellants argue that the advisory commission recommendation should be considered like a decision entitled to respect. It was a traditional comedy argument that a judgment of the States, the courts of Germany, should be afforded respect. And to be clear, we are not attacking the courts of Germany. That's a complete red herring in this case. We are saying there is no claim to be brought in Germany. And this is true. We know this because the defendant's expert, Professor Thiessen, acknowledges that it is at best a speculative possibility. Appellant's counsel referred to the Sachs case, which is true. Sotomayor It's speculative that there is a procedure available, or it's speculative that they would, that you would succeed? Wessler Speculative that there is a procedure available. I mean, one can go to court, but that the claim could be heard. Sotomayor Could what? Wessler Could be heard at all in the courts of Germany, because it can't. And the record below establishes that. The fight on that below is primarily on the forum nonconvenience argument, which the defendants have abandoned on appeal for the moment, or at least are not pressing for the moment, because the judge, in a sound and thorough review of that record, concluded that the alternative forum was not available. And that finding, which is subject only to an abuse of discretion review, is not even before us right now. And so rather than stick with that, because we've never argued that the advisory commission is a decision, and it's not, the sort of singular exception that the defendants are in effect asking this Court to make is create an exception for comedy in the unique circumstance in which a country has enacted an advisory panel with no legal effect so that they can just do that and go about their way. And the advisory commission is an issue. Roberts What's wrong with pursuing the claims in German courts? Wessler German courts will not hear Holocaust-related property claims. They have a 20-year bar to those claims procedurally. They can't be brought. The Sachs case is an outlier. It happened, but it's a unique event. And the stretching that's being requested here is by the appellants, which ask the Court to shoehorn into the FSIA a requirement that for a country that's enacted a panel, which, as we alleged, is not particularly serious, but if they want to prove that it's something that it's not, they can try that. But that's a defense. As the Court has noted in a number of questions, this is on a motion to dismiss. That is a defense that the appellants can raise. I want to make one final point in my answer. Sotomayor Excuse me. So your argument, then, is that at least on this record, we don't have to decide the question that Simon left open about exhaustion because there's no possibility of exhaustion here at all. Wessler Correct. And the Pimentel case that appellants raised. Sotomayor That's your argument. Wessler That's our argument. And I think — Sotomayor What would your position be if it was — if suit in Germany was possible? Wessler I think it's still a prudential question, Your Honor. And I think the Pimentel case cited by the appellants actually helps us because those — that concerned Filipino victims of the Marcos regime. And the logic or the analysis of saying, well, you need to go to the courts of your own country first before coming after the property, the location of the property and the property argument really is beside the point. It's the people and the availability. The last one I want to make as I — as I just come up against my time is we certainly acknowledge that the Court's holding last year in DeGeppo takes a disjunctive view of the commercial nexus requirement with regard to Germany, the Federal Republic of Germany, as opposed to the SPK, the Prussian Cultural Heritage Foundation. We would just ask the Court to revisit that question in the context of this case. The statute is written in the disjunctive. Sotomayor Well, how can we do that in this case? Wessler Well, Your Honor, I think the question is — Sotomayor We were bound by DeGeppo, right? This panel is bound by the decision in DeGeppo. Wessler I think — I think — Sotomayor Is this case distinguishable? Wessler On the commercial nexus question, no. Sotomayor Okay. Wessler No. Sotomayor So you agree we're — Wessler Yes. Sotomayor On the question of whether Germany is a proper party, DeGeppo decides the case, right? Wessler Yes. Sotomayor Okay. Thank you. Wessler So I will just limit my remarks, Your Honor. May it please the Court by saying — Sotomayor Yeah. Wessler — the precedent of U.S. policy and the direction of U.S. policy is clear and unambiguous, is in favor of claimants like ours, and we ask the Court to affirm the decision of the district court. Sotomayor Okay. Wessler Thank you. Roberts Okay. Mr. Freeman, you use it all the time, but you can take two minutes if you'd like  Freeman Thank you, Your Honor. Roberts And maybe start with the exhaustion question. Sotomayor Thank you, Your Honor. I thought I had reserved five for rebuttal, but I'm happy to use two. Taking the points in reverse order — Wessler Yeah. Sotomayor — comedy, opposing counsel misstated a few things. Our expert, in fact, did say that German courts are available. That's pages 187 to 189 of the joint appendix, as well as 293 to 294 of the joint appendix. The district court did not find that German courts were futile. That's page 345 of the joint appendix. To the extent there's any doubt as to whether the German courts could entertain such a claim, deference is due to Germany's interpretation of its own law. The only question is what level of deference currently pending before the Supreme Court in the animal science products case. Your Honors, first of all, it doesn't matter whether the commission was in the 50s, as it was in Bonsair, or it was 10 years ago, as here, or less than 10 years ago. It's part of the same policy of the foreign nations where the art is located, overseeing the restitution proceedings. The distinction between arbitration and mediation doesn't matter. The Washington principles talk about alternative dispute resolutions and contemplate both. As to the HERE Act and preemption in foreign policy, it says nothing about suits against foreign sovereigns. It says nothing about suits over art located abroad, and it cites domestic cases. The jurisdictional issues, Your Honor. First of all, there's a difference between genocide and discrimination or persecution. In the Shekel, this Court allowed the plaintiffs to amend their complaint under that statute. Under the FSIA, Your Honor? No, under the HERE Act. The plaintiffs had the opportunity of amending the complaint after the HERE Act. Yeah, because we found, the Court found the act controlling. And they were allowed to amend their complaint under the, to take advantage of the longer statute of limitations. Your Honor, as to the congressional finding of the Nazi looted art being a part of the genocide, we don't think that that's irrelevant, but it doesn't mean that this transaction was part of that looting of art. Congress did not say that every sale from 1933 to 1945 involving a German governmental entity was part of that genocide. No, it didn't. But counsel's argument is, is that any allegation about a forced sale at a, at a, at a less than fair market value is enough to survive a motion to dismiss. An allegation of a sale below market value or of a forced sale or of an outright expropriation is enough to allege a taking, but it, it, it does, it's not enough to allege a taking that is itself a genocidal act. And that's the question under Simon. And Your Honors need to look for that, again, to the international law definition of genocide. Genocide's the worst crime there is. There's no question that genocide did occur in Germany with regard to the Jews. But the question is whether this act was a genocidal act. And in order to determine that question, Your Honor, Judge, Judge Tandler, I refer you back to the oral argument in Helmreich a couple of days ago, this Court needs to look at the international law sources. And we've cited them in the brief. There is no authority finding that there's a genocidal taking in circumstances anything like this. And so to find that there's one here, to find that there was a genocidal taking here is to expand the narrow exception created in Simon to essentially eviscerate the domestic taking rule in any circumstance where a country later is involved in genocidal acts. Your Honor, that's hindsight bias. That's the reason the complaint weaves back and forth between the present and future. As opposing counsel noted just a few moments ago, one of the participants in the sale would later, years later, be part of the Wannsee conference at which opposing counsel said the destruction of European Jewry was planned. You can't look at the events of 1933 to 1935 through the lens of what happened later. The question is, was it a genocidal act when it happened under international law? Thank you, Your Honors. Thank you both. The case is submitted.
judges: Tatel, Griffith, Wilkins